IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **FLORENCE PARKER** | * | |
| PLAINTIFF | * | |
| VS. | * | |
| **ALLENTOWN, INC.** | * | CIVIL ACTION No. PWG- 11-569 |
| ET AL | * | |
| DEFENDANTS | * | |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFF'S ANSWER TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The plaintiff, Florence Parker, by Joseph T. Williams, her attorney, submits this Memorandum in support of her Answer to Defendant's Motion for Summary Judgment. The defendant's motion for summary judgment should be denied as there are genuine disputes of material facts, and the defendant is not entitled to entry of judgment in its favor as a matter of law, except as to count three.

INTRODUCTION

This case involves a large, heavy (770 lbs) and top-heavy animal cage rack, made and sold by the defendant. The plaintiff was working normally, and when she stood up onto her tiptoes to check animals in cages higher than her line of sight, she held onto the rack for support. No one had ever warned her that holding onto the rack could cause it to tip over, and no steps had been taken by the defendant to keep it from falling over when a user inadvertently applied too much force. Suddenly and unexpectedly (for her) the rack

4

itself fell over onto her.  She had inadvertently and unintentionally applied enough force

to the top that it fell over onto her, pinning her body and crushing her leg and arm.  She

claims that the rack was top-heavy and dangerous and defective in that it could easily be

tipped over.  She claims that the defendant knew or should have known that it was top-

heavy, easy to tip over and therefore dangerous, but that it never performed an

appropriate hazard analysis before selling the rack to her employer, Johns Hopkins

Hospital.  She claims that the rack was defective as designed and that a safety feature

could have been incorporated into the design at little or no cost in relation to the price of

the rack (several dollars to make it safe versus the selling price of $11,480). The seller,

defendant Allentown, denies those allegations.  Both sides have presented expert

opinions, which include both facts and opinions.

I.      STANDARD OF REVIEW

Summary judgment is appropriate under Rule 56 (c) of the Federal Rules of Civil

Procedure when there is no genuine dispute as to any material fact and the moving party

is plainly entitled to judgment in its favor as a matter of law.  In *Anderson v. Liberty

Lobby, Inc.*, the Supreme Court of the United States explained that in considering a

motion for summary judgment, "the judge's function is not himself to weigh the evidence

and determine the truth of the matter but to determine whether there is a genuine issue for

trial." 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L. Ed.2d 202 (1986).  A dispute about a

material fact is genuine "...if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." id at 248.  In analyzing whether a genuine issue of fact

exists, the evidence must be viewed in the light most favorable to the nonmoving party.

*Id*, at 255.  Because there are disputes as to material facts, and because the evidence

should be viewed in the light most favorable to the plaintiff, summary judgment should be denied, except as to count three.

II.     MATERIAL FACTS

1.      Allentown sold the rack in question, (according to the defendant's answer to interrogatory 6) to Hopkins in 2001 for $11,480; it weighed about 770 lbs. with the ventilation unit on top.   A photo of the unit (taken some time after the occurrence and so attached to the wall by a chain) is appended hereto as **Exhibit A**.

2.      The plaintiff was employed at the Johns Hopkins Hospital as an animal facility specialist or animal caretaker.   She is 5' 10" in height and the top row of cages was over her head.   **Exhibit E**, page 43, line 18 to page 44, line 6.

3.      Before Ms. Parker was injured, a co-worker, Nancy Taylor, was injured when a similar rack she was moving fell over and crushed her foot when its wheel went onto a drain, and the drain cover either broke or moved.   Regardless of whether the rack was standing in place or being moved, that incident proved that the rack was top-heavy and easy to tip over. Further that Allentown did nothing after that incident to make the racks safe for users.

4.      In a second incident before Ms. Parker was injured, an Allentown rack fell over while a co-worker, whom Ms. Parker referred to by the single name "Kami", was using it, but Ms. Parker did not know about that incident before she was injured.   Ms. Parker learned that Kami had not been injured in that incident.   Exhibit E, page 61, line 10 to page 63, line 20.   That incident demonstrated that the rack was top-heavy and easy to tip over inadvertently, and Allentown did nothing afterwards to make its racks, currently in use, safe for users.

5.      On the day she was injured, Ms. Parker, who normally worked at the main campus at Hopkins Hospital, was asked to report to a different facility, specifically the research facility at Hopkins' Bayview campus. She tried to find a stepladder but could not find one. Parker deposition, page 114, line 10 to 13. Because she could not find a ladder, she knew that in order to do her job and check the animals in the top rows of cages, she would have to pull the cages out starting with the cages in the top row, over her head. **Exhibit E**, page 115, lines 14- 17.

6.      Ms. Parker was working alone when the accident happened. She had pulled out the top row of cages to check the animals, and was working on the second row. She was standing up on her tip-toes and was holding the top bar with both hands to steady herself as she checked the high cages. **Exhibit E**, page 149, line 11 to page 152, line 2. As she was checking the cages the rack tipped over and fell onto her. **Exhibit E**, page 152, lines 3- 6.

7.      The rack fell onto Ms. Parker, pinning her body. She was able to get her body out from under it, when it fell onto her hand. **Exhibit E**, page 157, line 8 to 159, line 16. She was trapped in the room (which had no communications devices and allowed no cell phone service, for about 45 minutes. **Exhibit E**, page 159, line 21 to 160, line 17.

8.      While in the hospital, heavily medicated, she was visited by Candace Wolf, a Hopkins administrator, who asked her what happened and filled out a report. Ms. Wolf wrote that Ms. Parker had:

> "Stepped on bottom row/ bar to see top shelf. Rack fell over on her." See **Exhibit B**.

Subsequently, after Ms. Parker's mother, Hanan Abdullah, saw and read Exhibit B, she contacted Ms. Wolf on Ms. Parker's behalf and asked her (Ms. Wolf) to correct the report. **Exhibit E**, page 174, line 15 to page 176, line 3.

Ms. Parker does not read well. **Exhibit E**, page 216, line 3 to page 217, line 2. Also, **Exhibit E**, page 226, line 14 227, line 9. Additionally, she was heavily medicated when she talked to Ms. Wolf. **Exhibit E**, page 169, line 17 to 19. Ms. Parker thought she was dreaming that Ms. Wolf had come to talk to her. **Exhibit E**, page 167, line 1 to page 169, line 14.

Subsequently, Ms. Parker reported to MOSH that she had "pulled up on the rack to check on the top level and it fell on me". See **Exhibit C**, MOSH interview worksheet.

ALLENTOWN

Allentown has never undertaken a study to make sure that the racks are safe for users. Coiro deposition, Exhibit F, page 9, line 18 10, line 3. Allentown's president is aware that there are safety and human factors engineers that can be retained to look at a product to make sure it is safe, but no such expert or engineer has ever been retained to look at the racks to see if they are safe. **Exhibit F**, page 10, line 5- 15.

Allentown has had no employees whose job is to make sure that the racks are safe. **Exhibit F**, page 10, lines 16 to page 11, line 5.

Mr. Coiro contends that Allentown was never aware that the racks could tip over under certain circumstances. **Exhibit F**, page 23, line 19 to page 24, line 5. He does admit, however, that he is aware of similar products, like bookshelves, that may or may not be secured to a wall to prevent them from tipping over. **Exhibit F,** page 15, lines 3 to 19.

Mr. Coiro does not know if the rack was "top-heavy". **Exhibit F**, page 24, lines 6 to 19.

Allentown did have a "tilt test" done on June 1, 2006. A copy of the report is appended hereto as **Exhibit G**. Although Mr. Coiro claims that he never thought a rack could tip over accidentally, when a similar rack was tested to see if the vibrations from the ventilation unit would cause problems for the residents of the cages in the rack, it was also tested to see if it would tip over at 10 degrees. IBM determined that the rack would not tilt or tip over by itself at 10 degrees.

Allentown never gave any warnings or instructions about how to install or set up the racks, other than instructions concerning matters that affected the health of the ultimate residents of the rack.

Allentown, to ensure the safety of users of its racks, did nothing other than to make sure that the metal has no sharp edges or burrs that would cut the skin of users. **Exhibit F**, page 31, lines 9-32, line 11.

Allentown has a safety committee to make sure working conditions in the Allentown plant are safe, but no such committee, or group to make sure the racks are safe for users. **Exhibit F**, page 54, line 6 to page 55 line 18. The Quality Assurance Group simply checks the rack meets the dimensions on the blueprints, not whether they are top-heavy or otherwise unsafe for ultimate users.

No inquiry has ever been conducted of Allentown salespeople to see if they have knowledge of any other rack that has ever fallen over. **Exhibit F**, page 74, lines 6 to 10.

MARYLAND OCCUPATIONAL SAFETY AND HEALTH (MOSH)

MOSH investigated and issued a Citation and Notification of Penalty to Hopkins. Undoubtedly, the admissibility of the MOSH investigation and report and the consequences will be the subject of a ruling before trial. The plaintiff contends that it is admissible. Appended hereto as **Exhibit D** is a copy of the 6-page Citation; the appended documentation is not included, as it is quite voluminous. The condition found by MOSH was (on page 5 of 6):

> "Employees were exposed to being struck by/ crushed by overturning animal storage racks, weighing approximately 750 to 1100 pounds, as a result of the rack's not having adequate base to height ratios."

The Citation noted: "Among other methods, one feasible and acceptable method to correct this hazard is to either increase the base dimensions of the racks by the installation of outriggers, or diminish the height of the racks by the removal of the rack's HVAC systems."

To abate the dangerous condition, Hopkins agreed with MOSH to secure all racks to a wall "when they were not being moved", with chains.

PLAINTIFF'S EXPERT BRIAN O'DONEL

Plaintiff's expert, Brian O'Donel, inspected the subject rack and performed some tests on similar racks. His findings are:

> "1.    The rack was front-heavy and top-heavy, with a propensity to tip over, which was a defect and cause of Parker's injury.
>
> 2.    The rack was unreasonably and unnecessarily dangerous, and defective in a manner that was a cause of Parker's injury;
>
> 3.    Allentown knew, or should have known, of the tip-over hazard of the rack, which was a cause of Parker's injury.

10

4.  Allentown had an obligation to analyze potential hazards in the animal cage rack, but failed to do so; that failure was a cause of Ms. Parker's injury.

5.  Allentown violated industry guidelines which denied Ms. Parker the protection intended by those guidelines which was a cause of Ms. Parker's injury.

6.  The rack was unsafe for its intended purpose, it was defective, and was dangerous in a manner that caused Ms. Parker's injury.

7   Allentown provided no instructions for safe use or warnings of the tip-over hazard, which was a defect that caused the injury.

8.  The combination of the heavy cart (rack) hazard and the exposure caused by the tipping created an unreasonably and unnecessarily dangerous condition that caused her injury.

9.  Certain improvements were available and feasible and quite inexpensive and would have prevented the injury." Please see **Exhibit H**, a copy of his report.

Subsequently Mr. O'Donel conducted a test of a similar rack (and videotaped the demonstration) and determined that it could be pulled over by the application of less than 50 pounds of force. In essence, he demonstrated factually that the rack could be pulled over "easily", which the defense disputes.

III     DISPUTES OF FACT

There are four disputes of fact:

a.   **Was the plaintiff standing up on her tiptoes, holding onto the rack but not stepping on the bottom rung, when it fell over onto her?**

Ms. Parker claims that she did not step up onto the first rung of the rack as the defendant alleges. She alleges that the rack fell over onto her while she was standing up on her tiptoes in order to see animal cages that were higher than her eye level, and that she was

holding on the rack for support as she did. The defendant claims that it is impossible for

that to have happened. In its answer to interrogatory 15, the defendant states:

> "Defendant was advised by Johns Hopkins personnel that Plaintiff stood or
> climbed onto the rack causing it to tip over, even though there were step ladders
> available for her use."

Also, defense expert Alfred Cipriani's opinion is that it would be impossible for the

accident to have happened as Ms. Parker claims:

> "Question: Your third conclusion was that the accident could not have
> occurred in the manner described by Ms. Parker in her deposition
> testimony.
>
> "A. One, you can't just hang on it and tip it, my numbers indicate that and
> my own testing indicated that. Two, even if you stand on the bottom bar
> and swing to try to make it go over, it still takes some effort to do that. So
> it has to be more intentional than, how should I put it, inadvertent. And,
> third, given the numbers that you would need to apply for a horizontal
> force to tip it over, they're so large that reaching up and grabbing and
> pulling it over again would not be inadvertent." Cipriani deposition, page
> 31, line 12 to page 32, line 1.

Mr. Cipriani, however, did agree with Mr. O'Donel's finding that a horizontal force of

less than 50 lbs. would be required to tip it over. Cipriani deposition, page 16, lines 1-8.

**b.     Was the rack easy to tip over, by inadvertent but foreseeable usage,**

**upon an application of less than 50 lbs of force?**

The plaintiff contends that the rack was easy to pull over, as it was top-heavy and

therefore defective and inherently dangerous while being used in a foreseeable manner.

The plaintiff contends she was using the rack as intended, simply trying to check

on the mice, and as she stood up on her tiptoes and held onto the rack for support, it

tipped over and fell onto her. The defendant denies plaintiff's allegations, and denies that

expert Brian O'Donel's simulation is an accurate re-enactment of the circumstances.

**c.** **Can the defendant can state, reliably and credibly, that no other racks have fallen over or tipped, when two other racks have fallen over at Hopkins and it has made no efforts to learn from other customers whether other racks have tipped over or fallen over while in use?**

Although the defendant claims that it has not been sued by any person other than Ms. Parker, and that it does not know of any other situations in which racks have fallen over while being used, that is quite different than stating that it has asked its customers and salespeople whether other racks have fallen over, under any circumstances. The fact that three racks have fallen over at Hopkins suggests that other racks may have fallen over in other facilities, but that Allentown has not conducted an inquiry about any other incidents. Absent such an inquiry, Allentown has no basis for concluding reliably that no other racks have ever fallen over.

**d.** **Did the defendant performed a/ any hazard analysis while the product was being designed and tested before it was sold, and should that hazard analysis have included post-sale inquiries to all customers as to problems or incidents in which a rack has tipped over or fallen over?**

The plaintiff claims that Allentown had an obligation to do a hazard analysis before selling the top-heavy metal rack to Hopkins, and to design safety features into the product before selling it. See Mr. O'Donel's report, **Exhibit H**. Although Mr. O'Donel opines, based on Mr. Coiro's deposition, that no hazard analysis was done, defense expert, Mr. Cipriani, contends that a de facto or unofficial hazard analysis was done:

> "Question: Was that no risk analysis or hazard analysis was done by Allentown?

Answer: Well, I'm not sure that he quite said it that way. I don't believe they did an official hazard analysis. They've been manufacturing this thing since well way back and they've had no incidents with it of any consequence until this. So in a manner of speaking, their hazard analysis has been a development over time that they don't have a problem in that regard. So you know we've formalized, I guess over the last 30 years we've formalized this risk hazard analysis so we have these steps now, but in the earlier days, you built equipment, you did some testing, made sure it was okay, but you didn't call it a hazard analysis. And so I believe they did it, but just not under the classic name of a hazard analysis." Cipriani Deposition, page 17, line 18 to page 18, line 15.

IV.    APPLICABLE MARYLAND LAW

NEGLIGENCE

The manufacturer of a product has a duty to use reasonable care in the design, manufacturing, testing and inspection of the product to see that the product is safe for any reasonably foreseeable use. A failure to fulfill that duty is negligence. *Moran v. Faberge, Inc.*, 273 Md. 538, 543, 332 A.2d 11, 15 (1975), *Banks v. Iron Hustler Corp.*, 59 Md. App 408, 475 A.2d 1243 (1984), *Pennwalt Corp. v. Nasios*, 314 Md. 433, 550 A.2d 1155 (1988).

DUTY

"The manufacturer of a product has the duty to use reasonable care in the design, manufacturing, testing and inspection of the product to see that the product is safe for any reasonably foreseeable use. A failure to fulfill that duty is negligence." MPJI 26:1 (a) (2005 update)

"If despite exercising reasonable care in the design, manufacturing, testing and inspection of the product, the product still cannot be made safe for its reasonably foreseeable use, and the manufacturer knows or through the use of foreseeable care should know that the dangerous condition is not obvious to the user of the product, the

manufacturer has a duty to give adequate warnings of the danger.  A failure to fulfill that duty is negligence." MPJI 26:1 (b)

A manufacturer has a duty to warn with respect to latent dangerous characteristics of the product, even though there is no 'defect' in the product itself. The failure to give such a warning when it is required is itself a defect in the product and will, without more, cause the product to be unreasonably dangerous as marketed. In such a case, a product, although faultlessly manufactured and designed, may be defective when placed in the consumers' hands without an adequate warning concerning the manner in which to use the product safely. **3 American Law of Products Liability 3d**, § 32:2 (1993).  *Mazda Motors of America, Inc. v. Rogowski*, 105 Md.App. 318, 659 A.2d 391

## INDETERMINATE DEFECT

When circumstantial evidence is used to prove a product defect, Maryland applies the "indeterminate defect" theory.  This approach allows an inference of a defect "to be drawn from the happening of an accident, where circumstantial evidence tends to eliminate other causes, such as product misuse or alteration."  (quoting *Harrison v. Bill Cairns Pontiac, Inc.*, 77 Md. App. 41, 549 A.2d 385, 390 (Md. 1988). Five factors must be considered when evaluating whether the "indeterminate effect" theory applies:  "(1) expert testimony as to possible causes; (2) the occurrence of the accident a short time after the sale; (3) same accidents in similar products; (4) the elimination of other causes of the accident; (5) the type of accident that does not happen without a defect." *Id.*

The plaintiff does not claim that the defects in the rack were indeterminate, but rather the defects were such that it would be impossible to determine the precise factors that caused the rack to tip over. How far from the rack was Ms. Parker standing?  How

much force did she apply as she stood on her tiptoes and held onto the rack for support as she checked the animals?  Precisely where was the center of gravity on the rack that day, given the number of animals, the number of cages, and the slope of the floor?

## FAILURE TO WARN

Products liability law imposes on the manufacturer a duty to warn if the product has an inherent and hidden danger the producer knows or should know could be a substantial factor in causing injury.  *Moran, supra.* The duty to warn of latent dangers inherent in the use of the product extends beyond intended uses to include uses that are reasonably foreseeable. *Moran v. Williams*, 19 Md. App 546, 313 A.2d 527 (1974).

## PRODUCT DEFECT

"Under Maryland law, a plaintiff in a products liability action must establish three evidentiary 'basics' regardless of the theory of recovery: (1) the existence of a defect; (2) the attribution of the defect to the seller; and (3) a causal relation between the defect and the injury." *Assurance Co. of Am v. York Int'l. Inc.*, 305 Fed. App'x 916, 921 (4th Cir.2009) (quoting *Jensen v. Am. Motors Corp.*, 50 Md. App 226, 437 A.2d 242, 247 (Md. 1981).  "Three types of evidence may be used to show a product defect:  (1) direct proof based on the nature of the accident in the context of the particular product involved; (2) circumstantial proof based on an inference of a defect from a weighing of several factors; and (3) direct affirmative proof through opinion testimony by an expert witness." *Id.* (quoting *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp.2d 378, 407- 08 (D. Md. 2001).

## STRICT LIABILITY

"The manufacturer or seller of any product in a defective condition that is unreasonably dangerous to the user ... is responsible for physical harm resulting from the defect, provided:

1.    the product was in a defective condition at the time it left the possession or control of the seller;

2.    the product was unreasonably dangerous;

3.    the defect was the cause of the injuries, and

4.    the product was expected to and did reach the user without substantial change in its condition.

In an action for strict liability in tort based upon product defect, the plaintiff need not prove any specific act of negligence as the focus is not on the conduct of the manufacturer, but upon the product itself." MPJI CV 26:11 (2008 update).

This Maryland pattern jury instruction is based on *Phipps v. General Motors Corp.*, 278 Md. 337, 363 A.2d 955, 20 UCCRS 312 (1976), adopting the concept of strict liability in RESTATEMENT (SECOND) OF TORTS § 402A, as explained and expanded in *Singleton v. International Harvester Co.*, 685 F.2d 112 (4th Cir. Md. 1981). See also *Sheehan v. Anthony Pools, Div. of Anthony Indus. Inc.*, 50 Md. App. 614, 440 A.2d 1085, 32 UCCRS 1402 (1982), aff'd 295 Md. 285, 455 A.2d 434, 53 UCCRS 408 (1983); *Lloyd v. General Motors Corp*, 397 Md. 108, 916 A.2d 257 (2007).

Strict liability is "akin" to negligence, the major difference relates to the proof required. *Klein v. Sears Roebuck & Co.*, 92 Md. App 477, 608 Md. 1276, cert denied, 328 Md. 447, 614 A. 2d 973 (1992).

Strict liability on the part of a manufacturer exists even though all possible care was used; compliance with industry standards may be irrelevant in a strict liability case even though it may be relevant in a negligence case. *Banks v. Iron Hustler Corp*, supra. See also *Ellsworth v. Sherne Lingerie, Inc.* 303 Md. 581, 495 A.2d 348 (1985).

V.    ARGUMENT

17

The plaintiff claims that she was standing up on her tiptoes, holding onto the rack for support, when it tipped over and fell onto her.  Her expert has measured the rack and tested it and determined that it was top-heavy, easy to tip over inadvertently, and will tip over with less than 50 lbs. of force.  Her accident was the third situation in which an Allentown rack has fallen over at Hopkins.  She claims that Allentown was required to do an appropriate hazard assessment of the rack before it was sold, and that had one been done, the defect/ hazard would have been detected, and Allentown would/ should have added or incorporated a simple and inexpensive feature to keep it from tipping over. MOSH investigated, found the rack dangerous, and ordered Hopkins to take steps to keep its racks from falling over in the future.

Although Allentown claims that no other racks have fallen over, the plaintiff disputes that Allentown has conducted an inquiry that would provide the knowledge or basis necessary to make that statement.  At least two other racks have fallen over at Hopkins, demonstrating that Allentown's claim that this was the first incident in which a rack has fallen is untrue.

Under the circumstances there are genuine issues of material fact that must be decided by the trier of fact and defendant's motion for summary judgment should be denied.

Joseph T. Williams, Bar No. 1157
Williams & Santoni, LLP
401 Washington Avenue, Suite 200
Towson, Maryland 21204
Phone:  410-938-8666
Fax:  410-938-8668
jtw@williams-santonilaw.com

Attorneys for the plaintiff

18

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Memorandum of Points and

Authorities in support of Plaintiff's Answer to Defendant's Motion for Summary

Judgment has been served, by CM/ECF Document Filing System, upon Steven R.

Migdal, Esquire, Buck, Migdal & Myers, Chartered, P.O. Box 2400, Annapolis,

Maryland 21404-2400, this 2nd day of July, 2012.


Joseph T. Williams

19

## SCHEDULE OF EXHIBITS

A.    Photo of the rack (after the accident, secured to the wall by chain)

B.    The Johns Hopkins Institutions Employee report of incident instructions

C     MOSH interview worksheet

D.    MOSH citation (6 pages)

E.    Deposition transcript, Florence Parker (condensed)

F.    Deposition transcript, John Coiro, president/ corporate designee, Allentown

G.    IBM Animal Cage Vibration Measurement (and tilt test) dated June 1, 2006.

H.    Report by plaintiff's expert Brian O'Donel

20