**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Northern Division*

|  |  |  |
|---|---|---|

FLORENCE PARKER,

      Plaintiff,

v.                                **Civil Case No.: PWG-11-0569**

ALLENTOWN, INC.,

      Defendant.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

<u>**MEMORANDUM AND ORDER**</u>

This Memorandum and Order addresses Defendant Allentown, Inc.'s Motion for

Summary Judgment, ECF No. 27; Plaintiff Florence Parker's Answer to Defendant's Motion for

Summary Judgment ("Opposition"), ECF No. 29; and Defendant's Reply, ECF No. 31.  I find

that a hearing is unnecessary in this case.  *See* D. Md. Loc. R. 105.6.  For the reasons stated

herein, Defendant's Motion for Summary Judgment is GRANTED as to Counts Two and Three

and DENIED as to Counts One, Four, and Five.  This Memorandum and Order disposes of ECF

Nos. 27, 29, and 31.

**I.    BACKGROUND**

In reviewing the evidence related to a motion for summary judgment, the Court considers

the facts in the light most favorable to the non-moving party.  *Ricci v. DeStefano*, 129 S. Ct.

2658, 2677 (U.S. 2009); *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 391–92

(4th Cir. 2009); *Dean v. Martinez*, 336 F. Supp. 2d 477, 480 (D. Md. 2004).  Unless otherwise

stated, the background provided here is comprised of undisputed facts.  Where a dispute between the parties exists, however, the facts are considered in the light most favorable to Plaintiff.

Defendant is a company that manufactures and sells animal cage racks, which hold rows of animal cages that can be pulled out.  Compl. ¶¶ 4–5, ECF No. 2; Def.'s Mem. in Supp. Mot. 1 & 4, ECF No. 27-1; *see* Pl.'s Mem. in Opp'n 4, ECF No. 29-1.  In the last thirty years, Defendant has sold more than 20,000 such racks, and Johns Hopkins University ("Hopkins") has purchased nearly 1,000 of them.  Def.'s Mem. 3.  Defendant sold the animal cage rack at issue in this litigation to Hopkins in September 2001.  *Id.*; Pl.'s Mem. 6.  It was estimated that the cage rack weighed between 750 and 1100 pounds.  Dep't of Labor, Licensing & Reg., Occup. Safety & Health, Citation & Notification of Penalty 5 ("MOSH Citation"), Pl.'s Mem. Ex. D, ECF No. 29-5.

Plaintiff began working as an animal facility specialist/animal caretaker at Hopkins in September 2002.  Def.'s Mem. 3; Parker Dep. 33:7, 34:6–11, Pl.'s Mem. Ex. E, ECF No. 29-6. One of her primary responsibilities was to care for laboratory animals, such as rats and mice. Compl. ¶ 3; Def.'s Mem. 3.  The animals were kept in individual cages, stored in animal cage racks that Defendant manufactured.  Compl. ¶ 4; *see* Def.'s Mem. 4.

On or around September 22, 2009, Plaintiff was performing routine cage checks of the laboratory animals at Hopkins' Bayview campus.  *See* Compl. ¶ 5; Def.'s Mem. 4; Pl.'s Mem. 7. Because she was unable to locate a stepladder, Plaintiff checked the top row of cages on each rack, which were above her eyelevel, by pulling out the cages from the rack, taking them down, looking in them, and putting the cages back. Pl.'s Mem. 7.  When checking the second row from the top on the rack at issue, Plaintiff stood on her tiptoes and held onto the top of the rack with both hands.  *Id.*; Def.'s Mem. 4.   As she was checking that second row of cages, the cage rack

tipped over, falling on top of Plaintiff,  Pl.'s Mem. 7; Def.'s Mem. 4, and breaking her left leg in five places, MOSH Interview Worksheet, Pl.'s Mem. Ex. C, ECF No. 29-4.  She was trapped under the rack until a coworker discovered her, nearly forty-five minutes later.  Compl. ¶¶ 5–6; Pl.'s Mem. 7.  She then was transported to the hospital.  Compl. ¶ 6; Def.'s Mem. 4.

Plaintiff filed a five-count complaint on March 2, 2011.  Compl. 3–8.  First, Plaintiff alleged negligence, claiming that Defendant was "negligent in designing a rack that required the user to pull drawers[1] out, which would foreseeably shift the weight and balance of the rack, without including in the design a device or element that would prevent the entire rack from falling over."  *Id.* ¶ 11.  Second, Plaintiff alleged failure to warn, arguing that Defendant "failed to warn [Hopkins] and/or [Plaintiff] of the danger that the rack would tip over, that it was unsafe, that it needed to be secured to the floor or wall to be safe, and of other dangers."  *Id.* ¶ 14.  Third, Plaintiff alleged that Defendant breached the implied warranties of merchantability and fitness for a particular use.  *Id.* ¶¶ 17–20.  Fourth, Plaintiff alleged design defect, claiming that the product's design was defective because "it was not designed to be secured to the floor or a wall to keep it from tipping over while in use," even though its design made it unstable.  *Id.* ¶¶ 22–23. Finally, Plaintiff alleged strict liability, arguing that, as designed, the rack was "an abnormally dangerous product," that presented to its users "an unreasonably dangerous risk of harm."  *Id.* ¶ 28.  In light of these claims, each of which Plaintiff maintains was a direct and proximate cause of the injuries she sustained, Plaintiff requested five million dollars in compensatory damages. *See id.* at 8.

---

[1] Each row contained cages which could be pulled out, *see* Pl.'s Mem. 7; the parties sometimes refer to these cages as "drawers."

## II.   DISCUSSION

Summary judgment is properly granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Meson v. GATX Tech. Servs. Corp.*, 507 F.3d 803, 806 (4th Cir. 2007) (citing Fed. R. Civ. P. 56(c)). The party moving for summary judgment bears the burden of demonstrating that no genuine dispute exists as to material facts. *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). In reviewing a motion for summary judgment, the Court considers the evidence in the light most favorable to the non-moving party—here, Plaintiff. *Ricci*, 129 S. Ct. at 2677; *George & Co., LLC*, 575 F.3d at 391–92; *Dean*, 336 F. Supp. 2d at 480.

If the moving party demonstrates that there is no evidence to support the non-moving party's case, the burden shifts to the non-moving party to identify specific facts showing that there is a genuine issue for trial. To satisfy this burden, the non-moving party "must produce competent evidence on each element of his or her claim." *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999). Although the Court "must draw all reasonable inferences in favor of the non-moving party," that party "may not create a genuine issue of material fact through mere speculation, or building one inference upon another." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Runnenbaum v. NationsBank*, 123 F.3d 156, 163 (4th Cir. 1997); *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 817–18 (4th Cir. 1995)). Indeed, the existence of only a "scintilla of evidence" is not enough to defeat summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Instead, the admissible evidentiary materials submitted must show facts from which the finder of fact could reasonably find in favor of the non-moving party. *Id.*

## A.      Breach of Warranty (Count Three)

Defendant argues, Def.'s Mem. 15–16, and Plaintiff concedes, Pl.'s Opp'n ¶ 1, that Plaintiff's breach of warranty claim is time barred.  Defendant correctly notes that Md. Code Ann., Comm. Law § 2-725 establishes a four-year statute of limitations for breach of contract and breach of warranty claims,[2] yet Plaintiff filed her claims more than nine years after Defendant delivered the rack to Hopkins.  Def.'s Mem. 15–16.  Accordingly, with regard to Plaintiff's breach of warranty claim (Count Three), which is barred by the applicable statute of limitations, Defendant's Motion for Summary Judgment is GRANTED.

## B.      Products Liability – Design Defect (Counts One, Four, and Five)

In her first count, Plaintiff alleges negligence, asserting that Defendant designed a rack that "required the user to pull drawers out," an action that would "foreseeably shift the weight and balance of the rack" in such a way that it was likely to tip over.  *See* Compl. ¶ 11.  Moreover, Plaintiff claims that Defendant failed to include in the rack's design "a device or element that would prevent the entire rack from falling over" when drawers were pulled out.  *See id.*  Plaintiff states that she suffered injury as a "direct and proximate result" of Defendant's negligence, resulting in economic and noneconomic damages.  *Id.* ¶ 12.  Plaintiff maintains that she "acted reasonably at all times and did not cause or contribute to the occurrence" in any way.  *Id.* ¶ 13.

Similarly, in her fourth count, Plaintiff alleges design defect, claiming that the product's design was defective because "it was not designed to be secured to the floor or a wall to keep it from tipping over while in use," even though (1) "it was supported by rollers, which are

---

[2] Because this case is a diversity action in federal court, Notice of Removal ¶¶ 4–6, ECF No. 1, the Court must apply Maryland substantive law to the merits of the case.  *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938).  Statutes of limitations are substantive.  *Sun Oil Co. v. Wortman*, 486 U.S. 717, 726 (1988) (citing *Guaranty Trust Co. of N.Y. v. York*, 326 U.S. 99 (1945)).

inherently unstable"; (2) it "required the user to pull cages out, like drawers, which would forseeably [*sic*] shift the weight and balance of the entire rack"; and (3) it "was designed with a mechanical unit on top, which provided water and air for the animals below [and] created an additional instability, which made the rack dangerous and subject to tip over." *Id.* ¶¶ 22–23. Likewise, in her fifth count, Plaintiff alleges design defect, this time as a strict liability claim, arguing that, as designed, the rack was "an abnormally dangerous product," that presented to its users "an unreasonably dangerous risk of harm," *Id.* ¶ 28. For each of these claims she alleges that the design defect proximately caused her injuries. *Id.* ¶¶ 27 & 30.

Plaintiff's first, fourth, and fifth claims are, in essence, products liability claims of design defect, sounding in negligence and strict liability. Fed. R. Civ. P. 8(e) provides that "[p]leadings must be construed so as to do justice," and Fed. R. Civ. P. 1 instructs the Court to construe the rules "to secure the just, speedy, and inexpensive determination of every action and proceeding." Therefore, the Court will not exalt form over substance, and it will construe Plaintiff's first, fourth, and fifth claims as two counts of products liability, one for design defect in negligence and one for design defect in strict liability, each encompassing the relevant allegations contained in Plaintiff's Counts One, Four, and Five.

The negligence theory of product liability focuses on the conduct of the defendant, while the strict liability theory of products liability focuses "primarily on the *product* (and whether or not it can be deemed defective)." Paul Mark Sandler & James K. Archibald, *Pleading Causes of Action in Maryland* 255, 265 (4th ed. 2008) (emphasis in original) (citing *Collins v. Li*, 933 A.2d 528, 573 (Md. Ct. Spec. App. 2007)). Yet under both theories of recovery, "a plaintiff must show 'three product litigation basics—defect, attribution of defect to seller [or manufacturer], and a causal relationship between the defect and the injury.'" *Laing v. Volkswagen of Am., Inc.*,

949 A.2d 26, 39 (Md. Ct. Spec. App. 2008) (citing *Ford Motor Co. v. Gen. Accident Ins. Co.*, 779 A.2d 362, 369–70 (Md. 2001)); *see Stanley Martin Cos. v. Universal Forest Prods. Shoffner LLC*, 396 F. Supp. 2d 606, 618–19 (D. Md. 2005) (same); *Virgil v. Kash N' Karry Serv. Corp.*, 484 A.2d 652, 656 (Md. Ct. Spec. App. 2005) (same); *see also Watson v. Sunbeam Corp.*, 816 F. Supp. 384, 387 n.3 (D. Md. 1993) ("The elements of proof are the same whether the claim be characterized as one for strict liability or negligence.").

In Maryland, the existence of a defect may be established through (1) "direct proof based on the nature of the accident and the product involved"; (2) "opinion testimony of an expert witness"; or (3) "inference of a defect based on circumstantial evidence." *Fireman's Fund Ins. Co. v. Tecumseh Prods. Co.*, 767 F. Supp. 2d 549, 557 (D. Md. 2011) (citing *Assurance Co. of Am. v. York Int'l, Inc.*, 305 Fed. App'x 916, 921 (4th Cir. 2008)).  Proof of any such defect "must arise above surmise, conjecture or speculation." *Virgil*, 585 A.2d at 657.  The right to recovery "may not rest on any presumption from the happening of an accident." *Id.*  However, "the addition of any facts that provide proof of a defect beyond that of conjecture or speculation may be sufficient to withstand summary judgment." *Assurance Co. of Am. v. York Int'l, Inc.*, 305 Fed. App'x 916, 921 (4th Cir. 2008) (citing *C&K Lord, Inc. v. Carter*, 536 A.2d 699, 709–10 (Md. Ct. Spec. App. 1988); *Jensen v. Am. Motors Corp.*, 437 A.2d 242, 244 (Md. Ct. Spec. App. 1981)).  Design defect is one form of defect. *See Simpson v. Standard Container Co.*, 527 A.2d 1337, 1339–40 (Md. Ct. Spec. App. 1987).

## 1.    Design Defect – Negligence

Defendant's challenge to Plaintiff's negligence claim recites the four well-known elements of negligence—duty, breach, proximate cause, and damages—and focuses on showing that Plaintiff fails to allege the duty element.  Def.'s Mem. 10–12. It is true that, in addition to

the "product litigations basics" discussed above, *see Laing*, 949 A.2d at 39, the basic elements of negligence apply in negligence-based products liability cases. *See Banks v. Iron Hustler Corp.*, 475 A.2d 1243, 1250 (Md. Ct. Spec. App. 1984); *see also McKinney v. Fulton Bank*, 776 F. Supp. 2d 97, 104 (D. Md. 2010) (stating elements of negligence under Maryland law (quoting *Jacques v. First Nat'l Bank of Md.*, 515 A.2d 756, 758 (Md. 1986))). Yet, as a matter of law, "[a] manufacturer generally . . . has a duty to exercise reasonable care in the design and manufacture of his product." *Fischbach & Moore Int'l Corp. v. Crane Barge R-14*, 632 F.2d 1123, 1127 (4th Cir. 1980) (citing *Moran v. Faberge, Inc.*, 332 A.2d 11, 15 (Md. 1975)). Specifically, the manufacturer must design and manufacture the product so that it is safe for all reasonably foreseeable uses. *Am. Laundry Mach. Indus. v. Horan*, 412 A.2d 407, 412–13 (Md. Ct. Spec. App. 1980); *see* MPJI:Cv 26:1.a ("The manufacturer of a product has a duty to use reasonable care in the design, manufacturing, testing and inspection of the product to see that the product is safe for any reasonably foreseeable use."). Thus, Defendant had a duty to exercise reasonable care in designing an animal cage rack that was safe for all reasonably foreseeable uses. *See Fischbach*, 632 F.2d at 1127; *Am. Laundry Mach. Indus.*, 412 A.2d at 412–13. Additionally, with regard to the fourth element of negligence, damages, it is undisputed that Plaintiff suffered damages in the form of serious physical injury when the animal cage rack fell on her. Compl. ¶ 5; Def.'s Mem. 4 & 12. Consequently, the focus for summary judgment purposes must be on (1) whether there is a defect, (2) whether that defect is attributable to Defendant, and (3) whether a causal relationship (i.e., proximate cause) exists between the defect and injury, *see Stanley Martin Cos.*, 396 F. Supp. 2d at 618–19; *Watson*, 816 F. Supp. at 387, as well as (4) whether the rack was safe for all reasonably foreseeable uses, *see Fischbach*, 632 F.2d at 1127; *Am. Laundry Mach. Indus.*, 412 A.2d at 412–13.

### a.     Defect

Initially, in describing the rack's defect in her Complaint, Plaintiff claims that as she "was working with the animals, pulling out the cages to check on the status of their water and the cleanliness of the cages, the rack suddenly fell over on [her]." Compl. ¶ 5. Defendant argues that Plaintiff offers no evidence that "the rack tipped over when she pulled the mice cages out to check them." Def.'s Mem. 9. Indeed, Plaintiff never stated in her deposition or any of the statements that she provided after the accident that the accident occurred while the cages were pulled out. *See* Parker Dep. 145:1–156:2; Incident Report, Pl.'s Mem. Ex. B, ECF No. 29-3 ("Stepped on bottom row/bar to see top shelf. Rack fell on top of her."); MOSH Interview Worksheet ("While checking in rack I pulled up on the rack to check the top level and the rack fell on me."); Pl.'s Mem. 4–5 & 11–12 (referring only to tiptoes and holding onto top of rack; no reference to cages being pulled out). Rather, Plaintiff testified that she would put the cages back after she checked on them, Parker Dep. 147:3–8, that she had no trouble with the top row (the only row in which she pulled cages out), *id.*, and that the accident occurred when she was standing on tiptoes and holding onto the top row to look into the cages on the row that was second from the top, *id.* at 149:11–19 & 151:1 – 152:6. Although it is true, as Defendant argues, that "the accident had nothing whatsoever to do with the position of the plastic drawers/cages that hold the mice," Def.'s Mem. 9-10, such that Plaintiff's injury cannot be attributed to the aspect of the rack's design that featured cages that pulled out, later in her Complaint Plaintiff contends that other design defects exist. Compl. ¶¶ 22 & 24. Specifically, she alleges that the rack is unstable and therefore defective as designed because it is on coasters, *id.* ¶ 22, and because it is top-heavy due to the water and ventilation equipment at the top of the rack, *id.* ¶ 24.

Defendant contends that "there is no expert testimony from Mr. O'Donel [Plaintiff's expert] or anyone else suggesting that the rollers are unstable as alleged. Def.'s Mem. 16–17. Mr. O'Donel did conclude that the position of the wheels could "further increase the tip over hazard and propensity to tip over." O'Donel Report 4, Pl.'s Mem. Ex. H, ECF No. 29-9. More significantly, Plaintiff presents two items of evidence to establish the existence of instability as a defect in the cage rack: (1) a citation issued to Hopkins by Maryland Occupation Safety and Health ("MOSH"), an agency in the Maryland Department of Labor, Licensing, and Regulation, Division of Labor and Industry; and (2) the expert opinion and report of Brian O'Donel. Pl.'s Mem. 10–11. Plaintiff also maintains that the existence of a defect may be proved by circumstantial evidence under Maryland's "indeterminate defect" standard. *Id.* at 15–16. To be entitled to consideration on summary judgment, the evidence supporting the facts set forth by the parties must be such as would be admissible in evidence. *See* Fed. R. Civ. P. 56(c); *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993) ("The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof in the form of admissible evidence that could carry the burden of proof in his claim at trial.").

### i.        Maryland Occupational Safety and Health Citation

Plaintiff argues that an investigation and citation that MOSH issued to Hopkins is admissible to prove that the cage racks are defective. *See* Pl.'s Mem. 10. Specifically, the citation states that, in using the racks, employees "were exposed to being struck by/crushed by overturning animal storage racks, weighing approximately 750 to 1100 pounds, as a result of the rack's [*sic*] not having adequate base to height ratios." MOSH Citation 5. It also states several methods for correcting the hazard. *See id.* (listing "increas[ing] the base dimensions of the racks by the installation of outriggers" or "diminish[ing] the height of the racks by the removal of the

rack's HVAC systems" as options).  Also, with regard to a hazard posed in moving the racks (and therefore not relevant here), MOSH noted "the associated hazard of any applied force in the direction of the rack's depth direction."  *Id.*  In its reply, Defendant argues that Maryland Occupational Safety and Health Act ("MOSHA"), Md. Code Ann., Lab. & Empl. §§ 5-101 – 5-1001, regulations cannot be used to establish negligence *per se* because the statute prohibits private causes of action.  *See* Def.'s Reply 4.  Defendant further argues that the citation is irrelevant to determining if Defendant was negligent or if there was a defect because it was issued to Hopkins, not Defendant.  *Id.* at 4–5.

Defendant is correct that MOSHA regulations cannot "be used to establish negligence *per se*," *C&M Builders, LLC v. Strub*, 22 A.3d 867, 875 (Md. 2011), and that MOSHA "statutes and regulations apply only to the employer-employee relationship," *C&K Lord, Inc. v. Carter*, 536 A.2d 699, 710 (Md. Ct. Spec. App. 1988).  This, however, misses the point, because the evidence that Plaintiff presents is not a MOSHA regulation.  Instead, Plaintiff presents a citation issued to Hopkins by MOSH, the Maryland agency tasked with monitoring and enforcing workplace safety.  Additionally, Plaintiff does not present the citation to establish negligence *per se* or employer liability.  Rather, Plaintiff offers the evidence to prove that the condition that the animal cage rack was in when she was injured was defective in that it was unstable.  For that purpose, the MOSH Citation is evidence of a triable issue of defect, if otherwise admissible.

Federal Rule of Evidence 803(8)(A)(iii) establishes an exception to the hearsay rule (Fed. R. Evid. 802) with respect to a "record or statement of a public office" that "sets out . . . in a civil case . . . , factual findings from a legally authorized investigation."  In the oft-cited case *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988), the Supreme Court held that the term "factual findings," as used in Fed. R. Evid. 803(8)(A)(iii), encompasses "factually based conclusions or

opinions." *Beech Aircraft*, 488 U.S. at 162; *see id.* at 164, 166 ("[T]he language of the Rule does not create a distinction between 'fact' and 'opinion' contained in such reports. . . . The Advisory Committee's comments . . . contain no mention of any dichotomy between statements of 'facts' and 'opinions' or 'conclusions.'").  Reports containing facts, opinions, and conclusions may be excluded in whole or in part if the source or circumstances of their making is untrustworthy, Fed. R. Evid. 803(8)(B), and, as always, "the opponent[] [has the] right to present evidence tending to contradict or diminish the weight of those conclusions." *Beech Aircraft*, 488 U.S. at 168; *see O'Dell v. Hercules, Inc.*, 904 F.2d 1194, 1204–05 (8th Cir. 1990) (concluding that Arkansas Department of Pollution Control and Ecology's Technical Data Summary and Center for Disease Control report were admissible because, as held in *Beech Aircraft*, public agencies' "evaluative reports are admissible" if trustworthy); *id.* at 1206–07 (concluding that Environmental Protection Agency reports "are generally admissible under Rule 803(8)[(A)(iii)]," but not in the case before it because there were "substantial indicia of untrustworthiness").

*Masello v. Stanley Works, Inc.*, 825 F. Supp. 2d 308 (D.N.H. 2011) is informative. There, decedent Joseph Masello climbed on a stool at work, the stool collapsed, and Masello was injured and ultimately died. *Id.* at 311.  His estate brought "claims of negligent design and failure to warn, strict products liability, and breach of warranty" against the manufacturer and the distributor of the stool. *Id.* The defendants contended that the stool was not defective, but rather broken, at the time of the accident, and sought to introduce "a report of an investigation by the Occupational Safety and Health Administration ["OSHA"[3]] finding that [Masello's employer]

---

[3] Notably, "MOSHA is modeled on the Federal Occupational Safety and Health Act of 1970 (OSHA), 29 U.S.C.A. §§ 651-678 (2001), and tracks the Federal law in most respects." *Labor Comm'r v. Cole Roofing Co.*, 796 A.2d 63, 64 (Md. 2002) (footnote omitted); *see Bethlehem Steel Corp. v. Comm'r of Labor & Indus.*, 662 A.2d 256, 258 (Md. 1995) ("MOSHA and [OSHA], are substantially similar. When interpreting federal regulations enforced under

had violated federal workplace safety law by providing its employees with a broken stepstool."
*Id*. at 312.   The plaintiff moved *in limine* to preclude the evidence.   *Id.*

The court denied the plaintiff's motion, relying on *Beech Aircraft* and concluding that
"[t]he OSHA report . . . fit[] easily within [the Fed. R. Evid. 803(8)(A)(iii))] exception" to the
hearsay rule.   *Id*. at 315.   Further, the court rejected the plaintiff's argument that the OSHA
report was "untrustworthy because the investigation did not include 'any sworn statements,
cross-examination or proceedings in an adjudicatory venue," reasoning that "the test for
trustworthiness under Rule 803(8)[(A)(iii)] is not nearly so stringent."   *Id.*   The court also
rejected the plaintiff's arguments that the OSHA report was irrelevant and unduly prejudicial.
*Id*. at 316.   It said that the contents of the report, namely the summary of the condition of the
stools used in the decedent's place of employment, "ha[d] a 'tendency to make the existence of
[the compromised condition of the decedent's stool] more or less probable than it would be
without the evidence.'"   *Id.* (quoting Fed. R. Evid. 401).   The court determined that the OSHA
report was "'highly probative'" because it "reflect[ed] a comprehensive investigation of the very
same incident that gave rise to th[e] lawsuit."   *Id.* (citation omitted).   Moreover, it was not
unfairly prejudicial, given that, "[t]o counter the effect of the report, the plaintiff [would] be free
to emphasize any limitations on the investigation (including his point that OSHA's mandate is to
regulate the safety of the workplace, rather than the design of products) through appropriate
cross-examination or requests for limiting instructions or judicial notice."   *Id.*; *see also Hines v.
Brandon Steel Decks, Inc.*, 886 F.2d 299, 302 (11th Cir. 1989) (remanding case in light of *Beech
Aircraft* for trial court to reconsider admissibility of OSHA report that it had excluded); *Amos v.
W.L. Plastics, Inc.*, No. 2:07-CV-49 TS, 2010 WL 257267, at *1-2 (D. Utah Jan. 19, 2010)

MOSHA, [the Maryland Court of Appeals] look[s] to federal cases for guidance." (footnote
omitted)).

(denying defendant's motion *in limine* to exclude OSHA investigation and OSHA Citation Notification, except to the extent the documents contained hearsay statements; reasoning that the OSHA documents were admissible under Rule 803(8)[(A)(iii)], relevant, not prejudicial, and not likely to cause confusion; and noting that the citations "tend[ed] to implicate others, not Defendant").

Here, the citation at issue contains the factual finding, opinions and conclusions of the government agency MOSH following its investigation of the very incident that underlies this suit—the rack falling on Plaintiff. This Court has neither observed nor been presented with any facts calling into question the trustworthiness of the source or circumstances of the making of the MOSH Citation. Therefore, the MOSH Citation is admissible under Fed. R. Evid. 803(8)(A)(iii) for the purpose of proving that the racks are defective. *See Beech Aircraft*, 488 U.S. at 162, 168; *Masello*, 825 F. Supp. 2d at 315; *Amos*, 2010 WL 257267, at *1-2. Thus, to establish the existence of a defect, Plaintiff has identified admissible evidence in the form of a MOSH Citation that states that the rack is unstable as designed.

## ii.     Expert Opinion and Report

Plaintiff also offers the opinion of its expert, Brian O'Donel, to prove that the rack is defective. According to Plaintiff, Mr. O'Donel "inspected the subject rack and performed some tests on similar racks," Pl.'s Mem. 10, and concluded that the "rack was front-heavy and top-heavy, with a propensity to tip over, which was a defect." O'Donel Report 3–4. Defendant argues that Mr. O'Donel is not qualified to be an expert and that his testimony is neither reliable nor relevant. Def.'s Reply 8–13.

Pursuant to Fed. R. Evid. 104(a), the Court must determine "[p]reliminary questions concerning the qualification of a person to be a witness . . . or the admissibility of evidence,"

including the admissibility of expert testimony under Fed. R. Evid. 702.  *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 587–88 (1993).  A party offering an expert's opinion "bears the burden of establishing that the 'pertinent admissibility requirements are met by a preponderance of the evidence.'" *Cantrell v. Wirtgen Am., Inc.*, No. CCB-07-2778, 2011 WL 915324, at *2 (D. Md. Mar. 15, 2011) (quoting Fed. R. Evid. 702 advisory committee notes (citing *Bourjaily v. United States*, 483 U.S. 171 (1987))).  In determining the admissibility of an expert's opinion, the court must reconcile the intent for Rule 702 "to liberalize the introduction of relevant expert testimony" with "the high potential for expert opinions to mislead, rather than enlighten, a jury." *Id.*

To qualify as an expert under Rule 702, "a witness must have 'knowledge, skill, experience, training, or education' in the subject area in which he intends to testify."  *Id.* at *3 (quoting Fed. R. Evid. 702).  The sufficiency of an expert's qualifications "depends on 'the nature of the opinion he offers.'"  *Id.* (quoting *Gladhill v. General Motors Corp.*, 743 F.2d 1049, 1052 (4th Cir. 1984)).  Consequently, "[j]ust because a witness may be qualified as an expert in one area, 'does not *ipso facto* qualify him to testify as an expert in all related areas.'"  *Id.* (quoting *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 391 (D. Md. 2001)). Nonetheless, Rule 702 "takes a liberal approach to expert witness qualification," in that the "degree of 'knowledge, skill, experience, training, or education' sufficient to qualify an expert witness is only that necessary to insure that the witness's testimony 'assist' the trier of fact . . . to any degree." 29 Charles Alan Wright *et al.*, *Fed. Prac. & Proc. Evid.* § 6265 (1997).  Moreover, "the fit between an expert's specialized knowledge and experience does not need to be exact." *Cantrell*, 2011 WL 915324, at *3.  Thus, courts "have found witnesses to be qualified as experts based on only a relatively modest degree of specialized knowledge."  *Id.*

*Cantrell*, 2011 WL 915324, provides guidance.  There, the plaintiff, seriously injured on the job when a W2000 road milling machine ran over his foot and lower leg, brought claims of design defect in negligence and strict liability, as well as breach of warranty, against the companies that designed, manufactured, sold and distributed the W2000.  *Id.* at *1–2.  He offered the expert opinion of Mr. Clevenger, a mechanical engineer, and defendants moved to exclude, arguing that Mr. Clevenger was "not qualified to testify regarding the W2000 because he ha[d] never designed a road milling machine."  *Id.* at *2–3.  The court concluded that Mr. Clevenger had sufficient qualifications "to testify on whether the W2000 was defectively designed," reasoning:

> [There is no requirement] that Mr. Clevenger must have personally designed a road milling machine to be qualified as an expert in this case. *See, e.g.,* [*Shreve*, 166 F. Supp. 2d at 392] (citing *Lavespere v. Niagara Machine & Tool Works, Inc.*, 910 F.2d 167, 176 (5th Cir. 1990) (allowing a professor of mechanical engineering to testify about designing point-of-operation safeguards for the press brake industry even though he had never designed a press brake or safeguards because he had practical experience designing similar devices and had conducted a review of the relevant literature)). To establish that he is qualified to testify, Mr. Clevenger need only demonstrate that he possesses some special skill, knowledge, or experience concerning the issue before this court, i.e., whether the W2000 was defectively designed.
>
> Mr. Clevenger holds a bachelors and masters degree in agricultural engineering. He worked for over 35 years as a design and mechanical engineer at New Holland, during which time he held titles as Chief Engineer, Design Manager, and Design Engineer. Mr. Clevenger himself has designed and performed risk assessments of "hundreds of mobile machine products including industrial/construction equipment." . . . [I]t was part of Mr. Clevenger's job to evaluate the limits of mobile machinery by measuring its intended and reasonably foreseeable uses. For purposes of this litigation in particular, Mr. Clevenger also reviewed the deposition testimony of Wirtgen GmbH's safety director and design engineers and inspected the technical specifications for the W2000 product line. Finally, Mr. Clevenger conducted an inspection of an actual W2000, though not the same machine as the one involved in Mr. Cantrell's accident.

*Id.* at *3 (internal citations omitted).

The court also concluded, over the defendants' objections, that the plaintiff's other expert, Dr. Vigilante, was "sufficiently qualified to opine on whether the placement of the shovel holder directly above the crawler tracks was a foreseeable and unreasonable danger" and "to testify on whether an alternative design would decrease the possibility of an accident like Mr. Cantrell's." *Id.* at *4. Dr. Vigilante had "no engineering background" but held "a bachelors degree in psychology and a masters degree and PhD in ergonomics psychology"; worked for nine years "as a forensic scientist in the area of human factors, safety and risk perception, product design and development, and industrial safety"; and "performed numerous technical investigations and risk assessments on heavy construction machinery, including forklifts and excavators"; as well as prepared for the case by "examin[ing] depositions and discovery material, including specifications for the W2000, and perform[ing] a physical inspection of the machine itself." *Id.*

Here, Plaintiff's expert Mr. O'Donel holds a bachelor's degree in mechanical engineering from Pennsylvania State University, and has "more than thirty years of experience in industrial equipment safety, facilities engineering and maintenance, material handling and storage, and regulatory compliance." O'Donel Report 1. He regularly performs "industrial accident reconstruction and analysis." *Id.* Also, Mr. O'Donel reports that he has "a tremendous amount of experience with portable racks, carts, [and] racking systems," from which he is "able to formulate a comparison" to the rack at issue in this case. O'Donel Dep. I (Oct. 26, 2011) 43:14–17, Def.'s Reply Ex. 3. Additionally, he examined the rack at issue twice, as the experts did in *Cantrell*, and tested a rack with empty cages[4] to determine whether the rack was defective in that it was likely to tip over. O'Donel Report 2, 4. He concluded that, if the cages contained rodents

---

[4] Mr. O'Donel was not able to "tip test the full incident rack" because of "animal contamination constraints." O'Donel Report 4.

as they did at the time of Plaintiff's injury, "the force to tip would be less than 60 pounds," and "[f]loor slope, additional cage weights, and pulling the cages outward could decrease the load required to tip the storage unit." *Id.* at 4. He also observed that the rack's center of gravity was "located in front of the depth centerline and above the height center, which constitutes a front, top heavy condition," and that the position of the wheels could "further increase the tip over hazard and propensity to tip over." *Id.* Thus, his testimony is relevant to whether the rack was defective as designed. Moreover, he "possess[es] some special skill, knowledge, or experience concerning the particular issue before the court," *Cantrell*, 2011 WL 915324, at *3, that is, whether Defendant's design of the animal cage rack was defective. Therefore, in addition to the MOSH Citation, by offering expert testimony from Mr. O'Donel, Plaintiff offers admissible evidence with a sufficient factual basis to establish a triable issue with respect to the existence of a defect.

### iii. Indeterminate Defect

Alternatively, Plaintiff argues that circumstantial evidence establishes the existence of a defect. *See* Pl.'s Mem. 15–16. Maryland law provides that a defect may be inferred from circumstantial evidence under the indeterminate defect theory, which "allows a fact-finder to infer that a product defect caused a plaintiff's injury where circumstantial evidence tends to rule out other causes, such as misuse or alteration of the product." *Fireman's Fund Ins. Co. v. Tecumseh Prods. Co.*, 767 F. Supp. 2d 549, 557 (D. Md. 2011) (citing *Harrison v. Bill Cairns Pontiac*, 549 A.2d 385, 390 (Md. Ct. Spec. App. 1988)). Speculation, or the mere occurrence of the accident, is insufficient to establish a defect under this theory. *See id.* Rather, in considering whether an indeterminate defect exists, the Court must consider five factors: (1) "expert testimony as to other possible causes"; (2) "the occurrence of the accident a short time after the

sale"; (3) "same accidents in similar products"; (4) "the elimination of other causes of the accident"; and (5) whether the accident at issue is "the type of accident that does not happen without a defect." *Id.* (citing *Harrison*, 549 A.2d at 390).

Rather than providing evidence addressing each of the five factors listed above, Plaintiff states that she "does not claim that the defects in the rack were indeterminate, but rather [that] the defects were such that it would be impossible to determine the precise factors that caused the rack to tip over." Pl.'s Mem. 15.  Plaintiff then poses a series of questions:

> How far from the rack was [Plaintiff] standing?  How much force did she apply as she stood on her tiptoes and held on the rack for support as she checked the animals?  Precisely where was the center of gravity on the rack that day, given the number of animals, the number of cages, and the slope of the floor?

*Id.* at 15–16.  Unfortunately, the questions Plaintiff poses demonstrate an absence of admissible evidence addressing the five factors that underlie the resolution of an issue regarding indeterminate defect.

Considering the evidentiary basis, *vel non*, for the five factors stated above, as Plaintiff should have done, I find that Plaintiff has not established the existence of an indeterminate defect.  First, Plaintiff has provided no expert testimony eliminating potential causes of the accident other than design defect.  *See Fireman's Fund*, 767 F. Supp. 2d at 557.  Second, the accident did not occur a short time after the sale.  *See id.*  Indeed, as Plaintiff herself concedes, Defendant sold the rack at issue to Hopkins in 2001.  Pl.'s Mem. 6.  The accident occurred in 2009—eight years after the sale.  *See* Compl. ¶ 3.  Third, Plaintiff maintains that there are two other instances in which a Hopkins employee has been injured by an animal cage rack.  *See* Pl.'s Mem. 6.  In one instance, a co-worker, Nancy Taylor, allegedly was injured by a similar rack when it tipped over as she was moving the rack to a different location.  *See id.*; Def.'s Mem. 6.  Yet, Plaintiff admitted when deposed that "this was a totally different situation" because Ms.

Taylor "was moving a clean[ing] rack, not an animal rack," and "[a] cleaning rack holds 140 cages" and does not have a ventilation unit on top, while "[a]n animal rack holds 70" cages and has a ventilation unit on top.  Parker Dep. 59:16 – 60:21.  And, according to Defendant, the cause of Ms. Taylor's accident was "a defective floor grate," not the rack itself, and "Hopkins had no communications with [Defendant] about changing the design of the rack following this incident."  Def.'s Mem. 6; *see also* Def.'s Reply 2 (stating that Ms. Taylor's accident occurred when she was "transporting a rack from one location to another when a wheel dropped down into an unsecured floor drain").  Moreover, Ms. Taylor's accident occurred while the rack was being moved, while Plaintiff's accident occurred while the rack was stationary.  Def.'s Reply 2.  Defendant maintains that this factual dissimilarity renders Ms. Taylor's accident irrelevant, *see id.*  I agree.  The Taylor accident is substantially dissimilar to the facts of the present case and is not relevant in determining whether there is an indeterminate defect in this case.

In a second instance, another co-worker named Kamal Abdi, referred to as "Kami" in Plaintiff's filings, was purportedly injured when a rack fell on top of him.  Pl.'s Mem. 6; Parker Dep. 83:13–15.  According to Defendant, "Plaintiff's deposition testimony indicates that Plaintiff has no personal knowledge about this alleged incident, and her testimony on the subject is nothing more than rumor and hearsay."  Def.'s Reply 2.  Indeed, in her deposition, Plaintiff admits that her knowledge is based only on rumors, rather than personal knowledge, as Fed. R. Evid. 602 requires.  *See* Parker Dep. 62:1–3 ("I heard rumors that a rack had tipped over on Kami, . . . but I don't know what kind of rack."); *id.* 63:18–20 ("Q: In fact, you don't even know really what happened because it's just a rumor that you heard?  A: Yeah.  Yeah.  I heard it as a rumor."); *see also Virgil v. Kash N' Karry Serv. Corp.*, 484 A.2d 652, 657 (Md. Ct. Spec. App. 2005) (explaining that proof of a defect "must rise above surmise, conjecture or speculation").

In short, neither of the alleged prior incidents that Plaintiff offers is admissible to support her argument that there were prior accidents that evidence an indeterminate defect in the racks.

Fourth, Plaintiff has not, in any of her filings, eliminated other potential causes of the accident. *See Fireman's Fund*, 767 F. Supp. 2d at 557. Fifth, Plaintiff has not demonstrated that the accident at issue is the type of accident that does not occur in the absence of a defect. *See id.* Indeed, as Defendant notes, common sense "tells us that any movable piece of furniture or equipment can be pushed or pulled over under the right circumstances absent any manufacturing or design defect." Def.'s Reply 2. Because Plaintiff "has adduced no evidence as to any of the five factors that can prove indeterminate defect," I find that "there is no genuine dispute between the parties as to any material fact," and that Plaintiff has failed to establish indeterminate defect as a matter of law. *See Fireman's Fund*, 767 F. Supp. 2d at 558. Nonetheless, as discussed *supra*, through the MOSH Citation and Mr. O'Donel's expert testimony, Plaintiff offers admissible evidence sufficient to establish a triable issue regarding the existence of a defect.

### b.      Attribution of Defect to Defendant

Plaintiff claims that the animal cage rack was "designed, manufactured, marketed and sold by the defendant[]," Compl. ¶ 4, and that "[a]t all times the defendant[] had control over the design of the rack," *id.* ¶ 29. Defendant admits that it "manufactured and sold animal cage racks," including the one at issue, to Hopkins, Def.'s Mem. 1 & 3, and does not suggest that its design should be attributed to anyone else or that the alleged defect occurred after Defendant sold the rack to Plaintiff's employer. Indeed, John Coiro, President of Allentown, when asked in his deposition whether "the rack was in essentially the same condition it was at the time of the injury as it had been when Allentown delivered it to Hopkins," answered that "it looked like it had some damage from falling over," without noting any other alterations. Coiro Dep. 75:1–8,

21

Def.'s Mem. Ex. B.  Therefore, it is undisputed that the design can be attributed to Defendant. Moreover, if the jury finds that the design is defective, a reasonable jury could attribute that defect to Defendant.  *See Laing v. Volkswagen of Am., Inc.*, 949 A.2d 26, 39 (Md. Ct. Spec. App. 2008); *see also Stanley Martin Cos. v. Universal Forest Prods. Shoffner LLC*, 396 F. Supp. 2d 606, 618–19 (D. Md. 2005).

### c.    Causal Relationship Between Defect and Injury

The parties agree that Plaintiff "applied enough force to the top [of the rack] that it fell over onto her."  Pl.'s Mem. 2; *see* Def.'s Mem. 12 (stating that "it is undisputed that the rack did not fall over by itself").  Yet, Defendant sees this undisputed fact as proof that the rack's design did not proximately cause it to tip over, because, in Defendant's view, it was Plaintiff's actions that caused the rack to tip.  Def.'s Mem. 12.  Defendant argues that "[a]ny equipment that has to roll across a floor on castors or wheels can tip over with the application of force" and "[t]he fact that Plaintiff is the only person over a 30-year period to be injured by an animal cage rack that fell while in a stationary position belies any claim that [the rack] was negligently designed or manufactured."  *Id.*; *see also* Def.'s Reply 2 ("[A]ny movable piece of furniture or equipment can be pushed or pulled over under the right circumstances absent any manufacturing or design defect.").  In contrast, Plaintiff alleges that there was a causal relationship between her injury and the rack's defective design, because the defect made the rack "easy to tip over, by inadvertent but foreseeable usage, upon an application of less than 50 [pounds] of force."  Pl.'s Mem. 12.  Each party provides admissible evidence in support of its position. *See* MOSH Citation 5 (risk existed that Hopkins employees would be "struck by/crushed by overturning animal storage racks . . . as a result of the rack[]s not having adequate base to height ratios"); O'Donel Report 3–4 (rack had "a propensity to tip over"); Coiro Dep. 42:18–19 ("we produced 20,000 racks [and] [t]here hasn't

been a problem" besides Plaintiff's injury); Coiro Dep. 44:14–21 (Defendant's operating manual instructs "educated purchasers like Johns Hopkins to . . . set their own SOPs [standard operating procedures]"); Coiro Dep. 75:13–16, 76:13–19 (no other reports of racks falling over).   Thus, whether a causal relationship existed between the rack's instability and Plaintiff's injury is disputed and should be determined by a jury, and a reasonable jury could find for Plaintiff.   *See Laing*, 949 A.2d at 39; *Stanley Martin Cos.*, 396 F. Supp. 2d at 618–19.

### d.    Reasonably Safe for All Foreseeable Uses

Defendant insists that the harm suffered by Plaintiff was not foreseeable.   Def.'s Mem. 10–11.   Yet, the issue is whether Plaintiff's *use* of the rack was foreseeable, i.e., whether Defendant should have anticipated that someone inspecting the upper racks of cages would hold on to the top of the rack to view the upper cages while on tiptoes or step on the bottom of the rack to view the upper cages.[5]   *See Derosiers v. MAG Indus. Automation Sys., LLC*, No. WDQ-07-2253, 2010 WL 4116991, at *6 (D. Md. Oct. 19, 2010) ("Maryland considers foreseeable use in a negligent design defect claim.") (citing *Am. Laundry Mach. Indus. v. Horan*, 412 A.2d 407, 413 (Md. Ct. Spec. App. 1980)).   Plaintiff claims that, at the time of her injury, "[t]he cage was being used as intended."   Compl. ¶ 4.   In Plaintiff's view, she "was working normally, and when she stood up onto her tiptoes to check animals in cages higher than her line of sight, she held onto the rack for support."   Pl.'s Mem. 4.   Additionally, Plaintiff asserts that "it was reasonably expected that the subject rack would be used in labs with non-level floors."   Compl. ¶ 25.

---

[5] It is disputed whether Plaintiff climbed on the rack or simply held onto it while standing on the floor. Pl.'s Mem. 11–12; Def.'s Mem. 4.  Because I consider the facts in the light most favorable to Plaintiff, *Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (U.S. 2009); *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 391–92 (4th Cir. 2009); *Dean v. Martinez*, 336 F. Supp. 2d 477, 480 (D. Md. 2004), I consider only the foreseeability of a user standing on tiptoes and steadying herself on the rack.

It is undisputed that the rack, including the wheels, is about six feet, eight inches high, (with an approximately eleven-inch-high ventilation until on top) with ten rows of seven cages each, intended to be used to contain animals.  O'Donel Dep. I 97:2–9; Parker Dep. 43:11 – 44:6.  Therefore, it is likely that an employee of one of Defendant's customers could not view the upper rows by standing flat footed in front of the rack.  Even with the manufacturer's written instructions for purchasers to set their own standard operating procedures to guide employees in how to view the upper rows safely, *see* Coiro Dep. 44:16–21, such as by using a stepstool or pulling out the cages and lowering them to eye level, a reasonable jury could find it foreseeable that employees occasionally might stand on tiptoes in an attempt to view the upper rows of cages without pulling them out or using a stool.  Further, a reasonable jury could conclude that it was foreseeable that an employee on tiptoes would use the top of the rack to steady herself.  *See Restatement (Second) of Torts* § 395 cmt. k ("Foreseeable uses and risks.  The manufacturer may . . . reasonably anticipate other uses than the one for which the chattel is primarily intended.  The maker of a chair, for example, may reasonably expect that some one will stand on it . . . .").  Moreover, a reasonable jury could conclude that it was foreseeable that an employee using the top of the rack for balance could pull the rack onto herself and be injured in that manner.  Thus, the jury could conclude that the rack was not reasonably safe for all foreseeable uses.  *See Fischbach & Moore Int'l Corp. v. Crane Barge R-14*, 632 F.2d 1123, 1127 (4th Cir. 1980); *Am. Laundry Mach. Indus. v. Horan*, 412 A.2d 407, 412–13 (Md. Ct. Spec. App. 1980).

To summarize the viability of the negligence claim, some, but not all, elements are disputed.  The existence of Defendant's duty is established as a matter of law; Plaintiff's injury is undisputed; and it is undisputed that, if the design of the rack was defective, that defect was attributable to Defendant.  There are disputes of material fact concerning whether the rack was

defective; whether the alleged defect was related causally to Plaintiff's injury; how Plaintiff used the rack; and whether that use was foreseeable.   Moreover, Plaintiff has offered admissible evidence in the form of a MOSH citation and Mr. O'Donel's expert testimony to establish the existence of a defect.   Consequently, Plaintiff is able to generate a triable dispute regarding a design defect products liability claim in negligence.   *See Stanley Martin*, 396 F. Supp. 2d at 618–619.   As the material facts and supporting evidence are disputed, summary judgment is not appropriate.   Accordingly, as to Counts One, Four, and Five, insofar as they allege design defect in negligence, Defendant's Motion for Summary Judgment is DENIED.

### 2.      Design Defect – Strict Liability

Defendant argues that summary judgment is appropriate on Plaintiff's claim of design defect in strict liability because "no recognized standard . . . was breached as to the design or manufacture of the subject product," and Plaintiff did not offer any expert testimony "suggesting that the rollers are unstable as alleged."   Def.'s Mem. 15.   According to Defendant, "Plaintiff's claim rests entirely on the testimony and opinion of her expert, Brian O'Donel," who is not "qualified to render any opinion in this case," and whose opinion is not "supported by sufficient facts or reliable methodology to be accepted by this Court."   Def.'s Reply 7–8.   Defendant argues that "without proof that specific manufacturing or design defects or a deviation from any applicable standard of care, there is no evidence of proximate causation to sustain Plaintiff's claim[] for strict liability."   *Id.* at 16.

As noted, a significant overlap exists between negligence and strict liability claims of design defect in that the claims share the "product litigations basics," i.e., a defect attributable to Defendant and a causal relationship between that defect and Plaintiff's injury.   *See Laing*, 949 A.2d at 39.   As discussed at length above, Plaintiff has provided sufficient admissible evidence

of these shared elements to survive summary judgment.  Yet, the claims diverge in that duty, breach, and foreseeability are not elements of a strict liability claim.  *See Phipps v. Gen. Motor Co.*, 363 A.2d 955, 958 (Md. 1976).  Rather, the elements of design defect in strict liability are "(1) the product was in a defective condition at the time that it left the possession or control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause of the injuries, and (4) that the product was expected to and did reach the consumer without substantial change in its condition."  *Id.*  Thus, for a seller or manufacturer to be strictly liable for a design defect, "the product must be both in a 'defective condition,'" as required in negligence and strict liability alike, "and 'unreasonably dangerous' at the time that it is placed on the market by the seller [or manufacturer]."  *Id.* at 959.  Defendant does not contend that the condition of the animal cage rack was any different "at the time it left the possession or control of the seller" from when Hopkins received it or when Plaintiff's accident occurred.  *See id.* at 958. Thus, the issue is whether Plaintiff has demonstrated admissible evidence that the rack "was unreasonably dangerous to the user or consumer."  *Id.*

To determine whether a product is "defective and unreasonably dangerous, for strict liability purposes," courts apply either the risk/utility test or the consumer expectation test. *Halliday v. Strum, Ruger & Co.*, 792 A.2d 1145, 1150, 1152 (Md. 2002).  The risk/utility test applies "when something goes wrong with the product," *id.* at 1152, such as here, where the rack tipped over.  Under the risk/utility test, a product is "defective and unreasonably dangerous . . . if the danger presented by the product outweighs its utility," *id.* at 1150.  The court considers:

(1) The usefulness and desirability of the product – its utility to the user and to the public as a whole.
(2) The safety aspects of the product – the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

*Klein v. Sears, Roebuck & Co.*, 608 A.2d 1276, 1280–81 (Md. Ct. Spec. App. 1992).

Here, there is undisputed evidence that the product is useful because it provides a storage solution for laboratory animals and is designed "to ensure the safety of the animals" in the cages. Coiro Dep. 5:18–21, 31:3–4. The fact that Defendant has sold about 20,000 animal cage racks, with "several" customers purchasing more than 1,000, *see id.* 32:12 –33:6, strongly suggests that customers have found the racks to be useful. The parties have presented no evidence of substitute products. Nor is there evidence that the rack's instability was obvious, or evidence of warnings or instructions from the manufacturer. Also, it appears that the manufacturer readily could spread the risk of loss, but there is no evidence to that effect.

The likelihood of injury is disputed. Defendant has provided evidence that it has not heard any reports of incidents for the approximately 20,000 similar racks it has sold. Coiro Dep. 10:1–2; 36:20–21. Yet, Plaintiff has provided admissible evidence that injury is likely. Specifically, in his report, Mr. O'Donel stated that "[t]he rack has a potential and propensity to tip over, a hazard, as designed and manufactured by Allentown," due in part to its "front, top heavy condition." O'Donel Report 4. Also, Mr. O'Donel testified that, "[b]ased on the description of the incident, based on how narrow the base is and how high the rack is, the

tendency [of the rack] is to tip."  O'Donel Dep. I 113:11–13.  Similarly, the MOSH Citation

stated that the rack lacked "adequate base to height ratios."  MOSH Citation 5.  Additionally, if

injury were to occur, it likely would be serious because the rack weighed "approximately 750 to

1100 pounds" and was "likely to cause death or serious physical harm to employees."  *Id.*  Also,

Plaintiff provided evidence that, although the user could avoid injury by not holding onto the

rack, a user is likely to hold onto the rack when pulling out cages, even if standing on a

stepladder.  Parker Dep. 148:15–19.  In her deposition, Parker stated that, even if a user were on

a ladder, the user "would still have to brace [her]self on something.  The ladder may be there but

when [she is] turning around and . . . holding a case in [her] hand, [she is] going to stop [her]self

from leaning over."  *Id.*

Most tellingly, the evidence shows that Defendant easily could "eliminate the unsafe

character of the product" by affixing warning labels or providing a mechanism for securing the

rack to the wall; neither solution would "impair[] its usefulness or mak[e] it too expensive to

maintain its utility."  *Klein*, 608 A.2d at 1280–81.  Indeed, for one customer, Allentown

provided, at additional cost to the customer, a "wall-mounted bracket assembly" to secure the

rack to the wall.  Coiro Dep. 35:1 – 36:1.  Also, "there were safer alternatives that Allentown

could have used, for instance, a wider wheelbase and a less high rack."  O'Donel Dep. I 115:6–8.

The MOSH Citation suggested that "one feasible and acceptable method to correct this hazard is

to either increase the base dimensions of the racks by the installation of outriggers, or diminish

the height of the racks by the removal of the rack's HVAC systems."  MOSH Citation 5.  Thus,

Plaintiff has presented sufficient admissible evidence that, when weighing the danger of the

product against its utility, a reasonable jury could conclude that the rack is unreasonably

dangerous.  *Phipps*, 363 A.2d at 958; *Halliday*, 792 A.2d at 1150, 1152.

Defendant also contends that the rack "was specifically designed in accordance with Hopkins's requirements including the use of large castors specifically requested by that customer." Def.'s Mem. 16. It is true that some states have adopted the legal principle that "[t]he contractor's defense shields a manufacturer from liability for injuries caused by a product fabricated according to specifications or plans provided by the purchaser." *Miller Metal Fabrication, Inc. v. Wall*, 999 A.2d 1006, 1010 n.5 (Md. 2010) (citing *Housand v. Bra-Con Indus., Inc.*, 751 F. Supp. 541, 544 (D. Md. 1990)). However, "[t]his doctrine has not been adopted in Maryland by a reported opinion of a State appellate court." *Id.* Also, jurisdictions that have recognized this defense have noted that it does not apply if "the specifications are so obviously dangerous that they should not be followed." *Thompson v. Hirano Tecseed Co.*, 456 F.3d 805, 809 (8th Cir. 2006).

More significantly, the contractor's defense does not apply if the customer specifies its requirements but the manufacturer is involved in the design. *See Thompson*, 456 F.3d at 811. In *Thompson*, the plaintiff/appellant, employee of defendant/appellee's customer, was injured when her "arm was crushed as she cleaned an industrial laminator" manufactured by defendant/appellee. *Id.* at 806. The customer had "specified many requirements for the laminator's coating system . . . but relied on [the manufacturer's] expertise in creating the finished coating assembly." *Id.* at 811. The plaintiff/appellant provided evidence that her employer "did not specify the mechanical design of the comma coater or the side dams" and "did not describe the shape, size, base material, or adjustment mechanism for these components." *Id.* The Eighth Circuit concluded that the district court should not have granted summary judgment in favor of the manufacturer because the plaintiff/appellant "presented adequate facts to the district court disputing whether [the customer] alone designed the laminator" and "[f]rom this

record, a jury could determine that both [customer and manufacturer] were designers of the defective comma coater." *Id.*

Here, Plaintiff has presented evidence that Defendant designed the animal cage rack to include wheels and the ventilation unit.  Mr. O'Donel stated in his report that Defendant "designs and manufactures animal cages for research facilities," and that "[t]he Allentown cage racks are designed to have individual pull out cages for viewing, feeding, and cleaning.  The racks are provided with casters."  O'Donel Report 2.  Additionally, when deposed, the company president explained that Defendant "make[s] animal caging" that includes "[v]entilation unit[s], [which are] part of some of the equipment," and wheels.  Coiro Dep. 5:18–20, 6:20–21, 65:21 – 66:1.  Although he described Defendant as a "custom manufacturer," Coiro affirmed that Defendant's 275–300 employees include engineers who design the racks and individuals who construct the racks.  *Id.* at 12:1–20, 36:4.

In contrast, the only evidence that Defendant presented that it followed Hopkins' specifications is Coiro's testimony that Hopkins "requested 8-inch casters," which made the rack taller than usual.  Coiro Dep. 47:4–5.  Defendant does not show, or even contend, that Hopkins designed the wheels, specified how they connected to the rack, or provided any other specifications with regard to the wheels.  Nor does Defendant show, or even argue, that the size of the wheels created or exacerbated the alleged defect.  Rather, Defendant argues that "[a]ny equipment that has to roll across a floor on castors or wheels can tip over with the application of force."  Def.'s Mem. 12.  Defendant also does not address whether the larger wheels were an obvious danger.  Thus, Plaintiff has presented sufficient evidence, especially in the face of Defendant's scarce evidentiary showing, to create a genuine dispute of material fact regarding whether Defendant contributed to the design of the wheels as a component of the animal cage

rack, and "[f]rom this record, a jury could determine that both [customer and manufacturer] were designers of the defective [rack]." *See Thompson*, 456 F.3d at 811. Therefore, it is not clear that the contractor's defense would apply even if recognized, *see id.*, and summary judgment is not appropriate on this ground. *See* Fed. R. Civ. P. 56(c); *Meson v. GATX Tech. Servs. Corp.*, 507 F.3d 803, 806 (4th Cir. 2007).

Consequently, based on the evidence that the rack was unreasonably dangerous, Plaintiff has demonstrated the existence of admissible evidence to establish a design defect products liability claim in strict liability. *See Phipps*, 363 A.2d at 958. Accordingly, as to Counts One, Four, and Five, insofar as they allege design defect in strict liability, Defendant's Motion for Summary Judgment is DENIED.

## C.    Failure to Warn (Count Two)

Plaintiff's second count, which alleges failure to warn, is really a subset of its negligence claim. Plaintiff maintains that Defendant had a duty to warn users of its product of potential hazardous conditions in the product. *See* Pl.'s Mem. 14–16. Defendant argues that it had no duty to warn Plaintiff of an obvious danger or a danger of which she was already aware. Def.'s Mem. 14. Defendant also asserts Maryland's sophisticated user defense. *See id.*

Under Maryland law, "the existence of a legal duty is a question of law to be decided by the court." *RLI Ins. Co. v. John H. Hampshire, Inc.*, 461 F. Supp. 2d 364, 367 (D. Md. 2006) (citing *Doe v. Pharmacia & Upjohn Co., Inc.*, 879 A.2d 1088, 1092 (Md. 2005)). Where there is no duty, "there can be no liability in negligence." *Id.* (citing *Walpert, Smullian & Blumenthal, P.A. v. Katz*, 762 A.2d 582, 587 (Md. 2001)); *see Housand v. Bra-Con Indus., Inc.*, 751 F. Supp. 541, 544 (D. Md. 1990) ("[If Plaintiff] has not produced sufficient evidence to establish the existence of any duty on the part of [Defendant, Defendant is] entitled to summary judgment.").

A manufacturer generally "has a duty to exercise reasonable care in the design and manufacture of his product." *Fischbach & Moore Int'l Corp. v. Crane Barge R-14*, 632 F.2 1123, 1127 (4th Cir. 1980) (citing *Moran v. Faberge, Inc.*, 332 A.2d 11, 15 (Md. 1975)).   However, "a manufacturer has no duty to warn of an open and obvious danger in its product," or a danger of which a person is already aware.   *Emory v. McDonnell Douglas Corp.*, 148 F.3d 347, 350 (4th Cir. 1998) (citing *Mazda Motor of Am., Inc. v. Rogowski*, 659 A.2d 391, 395 (Md. Ct. Spec. App. 1995); *Nicholson v. Yamaha Motor Co.*, 566 A.2d 135, 145 (Md. Ct. Spec. App. 1989)); *Figgie Int'l, Inc., Snorkel-Economy Div. v. Tognocchi*, 624 A.2d 1285, 1291 (Md. Ct. Spec. App. 1993); *see also Mazda Motor of Am., Inc. v. Rogowski*, 659 A.2d 391, 396 (Md. Ct. Spec. App. 1995) ("The eminently reasonable principle that there is no duty to warn of a risk which should be obvious to the user has long been recognized in failure to warn cases brought as traditional negligence claims.").   Whether a danger is open and obvious is a question that "cannot be analyzed in a vacuum." *Emory*, 148 F.3d at 350.   Instead, the Court should consider "the complexity of the machine, the knowledge, age, background, experience, intelligence, and training of the person injured, the extent to which his [or her] required contact with the device is routine and repetitive, [and] whether he [or she] is subject to distractions." *Banks v. Iron Hustler Corp.*, 475 A.2d 1243, 1251 (Md. Ct. Spec. App. 1984).   Thus, "if the expected user possesses extensive knowledge about the relevant product," for example, "it is difficult to establish a duty to warn on the part of the manufacturer." *Emory*, 148 F.3d at 350.   Indeed, "[t]he duty to warn extends only to those who can reasonably be assumed to be ignorant of the danger." *Id.* (quoting *Rogowski*, 659 A.2d at 395).

Here, Plaintiff possessed considerable knowledge about the product in question.   She had been employed in the same position at Hopkins since 2002, and had been working with the racks

for at least two years prior to her accident. *See* Def.'s Mem. 3; Parker Dep. 36:1–7. Plaintiff received training from Hopkins in how to use the racks, including a demonstration on proper use. Parker Dep. 36:17–39:18. Sometime after the initial training, Plaintiff was advised during a meeting with her supervisors that employees should use step ladders to access the higher shelves of the racks, although Plaintiff maintains that she was not explicitly instructed not to stand on or hold onto the racks. *Id.* at 41:10–43:1, 44:7–45:9. *But see* Geitz Dep. 14:9–15:1, Def.'s Reply Ex. 6 ("All employees, to the best of my knowledge, were informed not to climb up on the racks."); *cf. id.* at 73:12–21 (explaining that Mr. Geitz, a manager, had observed Plaintiff using stepladders in the past). Moreover, Plaintiff previously had noticed that the racks occasionally would shift or slide, and had notified Hopkins and requested that they attach the racks to the wall to avoid tipping. Parker Dep. 50:20–53:4. Given Plaintiff's training, experience working with the racks, and her previous complaints regarding the racks, it appears that Plaintiff was well aware of the risks presented by the racks. *See Banks*, 475 A.2d at 1251. Therefore, it cannot be said that Plaintiff was "ignorant of the danger" that the racks could tip over or slide, leading to potential injury. *See Emory*, 148 F.3d at 350. As a result, Defendant had no duty to warn Plaintiff of an obvious risk of which she was already aware, and Plaintiff's failure to warn claim cannot succeed as a matter of law.

Even were I to find, *arguendo*, that the danger presented by the racks was not open or obvious, Plaintiff's failure to warn claim is barred by Maryland's sophisticated user defense. Under that defense, "a supplier is not negligent when it relies on an intermediary 'already well aware of the danger' to relay any necessary warning." *Id.* at 352 (quoting *Eagle-Picher Indus., Inc. v. Balbos*, 604 A.2d 445, 463–65 (Md. 1992)). Rather, where "'the danger related to [a] particular product is clearly known to the purchaser/employer, . . . it becomes the employer's

responsibility to guard against the known danger by either warning its employees or otherwise providing the necessary protection.'"  *O'Neal v. Celanese Corp.*, 10 F.3d 249, 251 (4th Cir. 1993) (quoting *Kennedy v. Mobay Corp.*, 579 A.2d 1191, 1196 (Md. Ct. Spec. App. 1990)).  In determining whether a supplier reasonably relied on an intermediary to give warnings, the Court considers several factors: (1) "the dangerous condition of the product"; (2) "the purpose for which the product is used"; (3) "the form of any warnings given"; (4) "the reliability for the third party as a conduit of necessary information about the product"; (5) "the magnitude of the risk involved"; and (6) "the burdens imposed on the supplier by requiring that he directly warn all users." *Eagle-Picher*, 604 A.2d at 464.

A consideration of these factors leads to two conclusions.  First, Defendant alleges, and Plaintiff does not contest, that Defendant has sold more than 20,000 similar racks in the last thirty years, and that Hopkins has purchased nearly 1,000 such racks. Def.'s Mem. 3.  In that time, Defendant has "had no notice of any design or manufacturing defects that caused one of these racks to fall resulting in personal injuries." *Id.* (citing Coiro Dep. 42:18–19); *see* Def.'s Mem. 10–11 ("Out of 20,000 racks sold worldwide, [Plaintiff's] accident is the only occasion when a stationary rack . . . fell onto someone.").  Consequently, Defendant had little, if any knowledge, of the risk posed by the product.  Second, the product, Defendant states, is a piece of "highly specialized equipment that is used exclusively in animal research facilities." Def.'s Mem. 3.  Consequently, Defendant "has always relied on its knowledgeable, commercial customers to formulate their own Standard Operating Procedures (SOP's) that would incorporate warnings and instructions to their employees assigned to work with these racks." *Id.*  Because Hopkins "has been purchasing these racks for decades and is experienced and knowledgeable about their use," *see id.* (citing Coiro Dep. 44:16–21, 77:6–79:16), and because Hopkins had

implemented standard procedures for using the racks, *see id.* (citing Coiro Dep. 79:6–9), Defendant asserts that it was reasonable for it to rely on Hopkins to warn its employees about the potential danger that the racks could tip if force is applied. I agree. Based on the foregoing uncontroverted facts that Defendant has demonstrated, I find that it reasonably relied on Hopkins to warn its employees of any potential dangers associated with the rack, and that, as a result, the sophisticated user defense bars Plaintiff's failure to warn claim as a matter of law.

In addition to the various considerations stated above, I note that "the failure to warn is not an independent theory of liability" under Maryland law, but a subset of tort liability. *Morgan v. Graco Children's Prods., Inc.*, 184 F. Supp. 2d 464, 466 (D. Md. 2002) ("[F]ailure to warn as a cause of action only states a claim in the context of forms of tort liability recognized in Maryland."). Consequently, stating that a Defendant "failed to warn with nothing else does not state a claim," and summary judgment is appropriately granted on this count. *See id.* (citing *Rogowski*, 659 A.2d at 394–95). Thus, for the foregoing reasons, as to Plaintiff's Count Two (Failure to Warn), Defendant's Motion for Summary Judgment is GRANTED.

## III.    CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment is GRANTED as to Counts Two and Three and DENIED as to Counts One, Four, and Five. Counts One, Four, and Five are consolidated into two counts of products liability, one for design defect in negligence and one for design defect in strict liability, each encompassing the relevant allegations contained in Plaintiff's Counts One, Four, and Five.

Counsel jointly will contact my chambers within fourteen (14) days to schedule a telephone conference with the Court regarding the remaining pretrial schedule and the setting of a trial date.


Dated: <u>September 19, 2012</u>                         <u>        /S/        </u>
                                                        Paul W. Grimm
                                                        United States Magistrate Judge

lyb/hlw